**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SEAN BOWENS,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | No. 10 C 2501 |
| v.      ) | |
| ) | Judge Virginia M. Kendall |
| MICHAEL RANDLE, et. al.      ) | |
| ) | |
| Defendants.      ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sean Bowens brought this *pro se* civil rights suit in April 2010 which was assigned to Judge Gottschall alleging he was denied medical care in violation of his constitutional rights while an inmate at Stateville Correctional Center in 2009. (Dkt. 5). The Amended Complaint states claims under 42 U.S.C. § 1983 against the Director of Illinois Department of Corrections (IDOC) Michael Randle, the Medical Director of IDOC Michael Puisis, Dr. Liping Zhang and Wexford Health Sources, Inc. ("Wexford"). (Dkt. 11). Plaintiff failed to serve Defendant Puisis and settled his claims against Defendant Randle in December 2017. (Dkt. 191). On March 16, 2018, Defendants Dr. Zhang and Wexford filed a Motion for Summary Judgment before this Court, seeking judgment in their favor on Plaintiff's claims against them. (Dkt. 204). For the following reasons, the Motion for Summary Judgment (Dkt. 204) is granted in part and denied in part.

## BACKGROUND

The Court takes the relevant facts from the parties' Local Rule ("LR") 56.1 statements of undisputed material facts and supporting exhibits: Defendants' Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment (Dkt. No. 205), Plaintiff's Rule 56.1(b)(3) Statement of Additional Facts in Support of His Response in Opposition to Defendants Liping

1

Zhang, M.D. and Wexford Health Sources, Inc.'s Motion for Summary Judgment (Dkt. 213), Plaintiff's Response to Defendants' Rule 56.1 Statement of Undisputed Facts in Support of Motion for Summary Judgment (Dkt. 214), and Liping Zhang, M.D. and Wexford Health Sources, Inc.'s Response to Plaintiff's Rule 56.1(b)(3) Statement of Additional Facts (Dkt. 221). The following facts are supported by the record and, except where otherwise noted, are undisputed.

## I.    Dr. Liping Zhang

Dr. Liping Zhang has been licensed to practice medicine in Illinois since 1992 and began working as a staff physician for Wexford in 1995. (Dkt. 214 at ¶¶ 5-7). As a staff physician for Wexford, Dr. Zhang's duties entailed receiving her daily assignment of patients and providing healthcare to those patients based on her own medical knowledge and experience. (*Id.* at ¶ 7). Dr. Zhang's clinical time was divided among the emergency room, sick call room and chronic disease clinics, which included clinics for hypertension, diabetes, asthma and seizures. (*Id.* at ¶ 10).

At Stateville, each day a nurse or medical technician at the facility provided Dr. Zhang with a pre-prepared list of inmates she was scheduled to see that particular day. (*Id.* at ¶ 8). Dr. Zhang would see each patient in the examination room she was assigned to for that day except for sometimes during a lockdown situation in which case the nurse would take Dr. Zhang directly to the inmates' cells. (*Id.* at ¶ 9). At each appointment, the nurse would take the patient's vital signs and then Dr. Zhang would perform a physical examination and listen to the patient's complaints. (*Id.* at ¶ 13). If Dr. Zhang were seeing a patient in a specialty clinic, such as the asthma clinic, as opposed to for a sick call, she would focus her treatment around the condition related to the specialty clinic. (Dkt. 221 at ¶ 9). If a patient made a complaint unrelated to that particular condition, she would determine whether the complaint was acute or serious and see the patient with regard to that complaint in a follow-up appointment or sick call appointment. (*Id.*).

Dr. Zhang was not involved in preparing the daily list of patients she was scheduled to see. (Dkt. 214 at ¶ 8). State of Illinois employees at the prison handled the actual scheduling of inmates for appointments. (*Id* at ¶ 8). However, if Dr. Zhang felt a patient needed a follow-up appointment, she would make a note in the record and the State nurse or medical technician would schedule the next visit accordingly. (*Id.* at ¶¶ 8, 11). Dr. Zhang also was not involved in receiving sick call requests from inmates requesting to be seen by the healthcare staff. (*Id.* at ¶ 8).

Only the medical director had authority to send a patient to an outside specialist. (*Id. at* ¶ 12). Dr. Zhang did not have such authority but if she felt a patient needed to see an outside specialist, she could refer the patient to the medical director. (*Id.* at ¶ 12; Dkt. 221 at ¶ 23).

## II. Plaintiff's Healthcare in Stateville in 2009

Plaintiff has asthma and has received regular treatment for his asthma while in IDOC custody, including an annual appointment to refill his asthma spray medication. (Dkt. 214 at ¶¶ 24-25). Plaintiff has been housed at various IDOC facilities but during the time of his claim, he was an inmate at Stateville. (*Id.* at ¶ 6).

Plaintiff testified that on February 8, 2009, he stopped a medical technician and explained that he had been experiencing sharp pains in his abdomen for a period of time and that the medical technician ignored his complaints and told him to submit a sick call request. (Dkt. 221 at ¶ 2). At that time, IDOC protocol required an inmate seeking medical attention for a non-emergent condition to submit a written sick call request by depositing the request slip into a box located in the cell house or by signing his or her name on a sheet located in the cell house. (Dkt. 214 at ¶ 41). Inmates are made aware of this process upon admission to the prison system, re-instructed on these procedures when transferred between facilities, and provided with an inmate handbook that details the process. (*Id.*) Per IDOC protocol, Wexford practitioners did not personally review any

sick call request. (*Id.* at ¶ 42). Rather, members of the IDOC-employed nursing staff typically screened these slips to determine what action should be taken regarding each inmate's request, consistent with nursing protocols developed by IDOC. (*Id.*).

Plaintiff testified that he had submitted sick call requests for three weeks leading up to February 8, 2009 and submitted additional requests on February 8 but received no response to his requests. (Dkt. 221 at ¶ 2.). Plaintiff testified that he also complained of abdominal pain to Sergeant Palmer on February 8, 2009 and that Sergeant Palmer called the hospital on his behalf. (*Id.* at ¶ 3). Plaintiff testified that he also complained of abdominal pain the following day on February 9, 2009 to both Lieutenant Davis and another medical technician and that the medical technician did not examine him or provide any assistance but that Lieutenant Davis may have called the hospital on his behalf. (*Id.* at ¶ 4).

On February 11, 2009, Dr. Zhang saw Plaintiff in the Asthma Clinic for his asthma condition. (Dkt. 214 at ¶ 14; Dkt. 221 at ¶ 6). During the appointment, Plaintiff complained of abdominal pain. (Dkt. 214 at ¶ 15). Specifically, Plaintiff testified that he told Dr. Zhang he was having sharp, severe pains in his stomach, cramps, dizziness and ongoing diarrhea. (Dkt. 221 at ¶ 10). Dr. Zhang made a note in Plaintiff's chart that he made a subjective complaint of abdominal pain. (Dkt. 114 at ¶ 15). Dr. Zhang took a history from Plaintiff related to his asthma but not related to his abdominal pain. (Dkt. 221 at ¶ 11). Dr. Zhang could not recall whether she performed a physical examination on Plaintiff regarding his abdominal pain and her records did not document or reflect that she did. (*Id.*).

During the February 11 appointment, Dr. Zhang ordered a blood panel which included a test for H. Pylori, a bacterial infection in the stomach that, according to Dr. Zhang, a person ingests from the consumption of dirty water or contaminated food and can cause stomach ulcers if not

treated. (Dkt. 214 at ¶ 16). Dr. Zhang told Plaintiff she would contact him once the results from the blood work came back. (*Id.* at ¶ 30). Dr. Zhang also ordered a renewal of Plaintiff's asthma inhaler medication, Albuterol. (*Id.*). She did not issue any prescription related to Plaintiff's complaints of abdominal pain at that time. (Dkt. 221 at ¶ 10).

The parties dispute whether Dr. Zhang had any knowledge at that time as to whether or not Plaintiff had previously complained of or requested medical attention for abdominal pain, constant stomach cramps or diarrhea before his appointment with her in February 2009, including whether Plaintiff had made such complaints to any medical technician. Dr. Zhang testified that she did not. (Dkt. 214 at ¶ 14). She also made no note in Plaintiff's medical record of whether Plaintiff had previously made such complaints or requests. (Dkt. 221 at ¶ 12). Dr. Zhang testified generally that, while at Stateville, she had communications with medical technicians about patients' treatment but could not recall about what they communicated or any details about any particular communication. (*Id.*).

Dr. Zhang reviewed Plaintiff's blood test results on February 18, 2009. (Dkt. 214 at ¶ 19). The test showed a positive finding of H. Pylori of 7.5. (*Id.*). Dr. Zhang saw Plaintiff for a second time on February 20, 2009 and discussed the test results with him. (*Id.* at ¶ 20). During the appointment, Dr. Zhang explained to Plaintiff that he had a bacterial infection. (*Id.* at ¶ 31).

Dr. Zhang wrote Plaintiff a prescription for the standard antibiotics treatment for H. Pylori, which was a combination of three medications: Doxycycline, Amoxicillin and Flagyl. (Dkt. 214 at ¶ 20). She also wrote a prescription for two months of Prilosec, an antacid for stomach pain. (*Id.*). At that time, Plaintiff was also receiving the Albuterol for his asthma and Remeron from his mental health provider for bipolar disorder or depression. (*Id.* at ¶ 21).

The parties dispute on what date Dr. Zhang issued the prescriptions related to Plaintiff's bacterial infection. The prescription form appears to be dated February 20, 2009. (Dkt. 205-1 at 142). But Plaintiff claims this date was changed and that Dr. Zhang did not actually issue the prescription until a later date. (Dkt. 221 at ¶ 18). Generally, after a doctor orders a prescription for an inmate, it is the duty of a nurse or medical technician to fill the order and have it delivered to the inmate. (Dkt. 214 at ¶ 17). The prescription was filled on February 24, 2009. (*Id.* at ¶ 32). Plaintiff received the prescribed medications on February 24 in his cell at Stateville in pill form with directions to take the pills twice a day. (*Id.*; Dkt. 221 at ¶ 19). Plaintiff testified that in the two weeks he waited for his prescription, he got "weaker, lost weight, continued to experience sharper pains and his bowel movements got worse." (Dkt. 212 at ¶ 14).

The parties do not dispute that the medication Dr. Zhang prescribed helped with Plaintiff's symptoms. (*Id.* at ¶ 33; Dkt. 221 at ¶ 20). Plaintiff testified, however, that his abdominal pain nonetheless persisted. (Dkt. 114 at ¶ 33).

Plaintiff saw Dr. Zhang for a final time on April 11, 2009. (Dkt. 214 at ¶ 22). Before this appointment, however, Plaintiff saw a Physician's Assistant on March 19, 2009. (Dkt. 214 at ¶ 22; Dkt. 205-1 at 46-47). The parties dispute whether Plaintiff complained of abdominal pain during the March 19 appointment. Plaintiff's medical records show the Physician's Assistant noted on March 19 only that Plaintiff complained of a knot in his lower back. (Dkt. 205-1 at 46). The records show also that on April 7, the Physician Assistant noted that a counselor informed her that Plaintiff had written a grievance about abdominal pain and back pain, that Plaintiff was seen on March 19 for his back, that the notes from the March 19 appointment were incomplete but that she recalled the visit and would complete them at that time. (Dkt. 205-1 at 47). The Physician's Assistant's April 7 notes then describe the March 19 examination as it related to Plaintiff's back

but do not reflect that Plaintiff complained of abdominal pain during the March 19 appointment. (*Id.*).

During the April 11 appointment with Dr. Zhang, Plaintiff complained of pink eye and low back pain. (Dkt. 214 at ¶ 22). Dr. Zhang prescribed Plaintiff Motrin and Gentamicin eye solution at that time. (*Id.*). The parties dispute whether Plaintiff made any complaints related to his abdominal pain or H. Pylori during this visit as well. The record from the April 11 appointment reflects no complaints related to abdominal pain on that date. (*Id.* at ¶ 34; Dkt. 205-1 at 48). However, Plaintiff testified generally that each time he visited the asthma clinic or was being treated for another condition in Stateville during this time, he complained about his abdominal pain and the healthcare provider would respond that he was not being treated for that issue at that time and, therefore, would not provide any treatment for his complaint. (Dkt. 221 at ¶ 20).

Plaintiff also saw another doctor on May 11, 2009, after his final visit with Dr. Zhang. (Dkt. 214 at ¶ 35). During the May 11 appointment, Plaintiff complained of low back pain after twisting his back while playing basketball but made no complaints of abdominal pain. (*Id.*)

As part of her routine practice, Dr. Zhang would conduct a repeat blood test for a patient with H-pylori if after a couple of months the patient complains of abdominal pain. (Dkt. 221 at ¶ 22). Dr. Zhang never ordered or performed any follow-up testing on Plaintiff related to his H-pylori while he was at Stateville. (*Id.*).

Plaintiff was transferred from Stateville to Lawrenceville Correctional Center ("Lawrenceville") in late May 2009. (Dkt. 221 at ¶ 25). Plaintiff was seen for abdominal pain on June 1, 2009. (*Id.*). Plaintiff then had a repeat blood test performed on July 1, 2009, which revealed Plaintiff had a positive result for H-pylori of 3.1. (*Id.* at ¶ 26). On July 1, 2009, the

medical personnel at Lawrenceville also diagnosed Plaintiff with lactose intolerance and a peptic ulcer and prescribed him Zantac, Maalox and Lactaid/Lactose medicine. (*Id.*)

In total, Plaintiff received medical treatment and evaluations on numerous occasions while in custody of IDOC, including at least 45 different medical visits for various complaints between 2009 and 2011. (Dkt. 214 at ¶ 36).

## III. Plaintiff's Grievance

At some time before April 2009, Plaintiff filed a grievance complaining that he had not received adequate medical treatment for his stomach pain. (Dkt. 221 at ¶ 28; Dkt. 205-2 at 171-72).[1] The grievance is dated February 8, 2009 but complains about care, or the lack thereof, provided by Dr. Zhang. (Dkt. 205-2 at 171-72). The grievance indicates that a counselor received the grievance on April 2, 2009 and responded on April 7, 2009, finding that Plaintiff had been seen by Dr. Zhang in February 2009, had put in for a sick call on March 23, 2009 but was not scheduled and, according to the Physician's Assistant's notes, would be scheduled for a sick call in the very near future. (*Id.* at 171). A grievance officer issued a report on May 21, 2009 finding the counselor had responded appropriately. (*Id.* at 170). The Chief Administrative Officer then issued a concurrence with the response and on June 5, 2009, Plaintiff appealed the decision to the Director. (*Id.*) On September 22, 2009, the Administrative Review Board recommended the grievance be denied, finding the issue was appropriately addressed, and on November 3, 2009, the Director concurred. (*Id.* at 168).

---

[1] Defendants object to Plaintiff's reliance upon this document as lacking foundation. However, "[a]n objection to lack of foundation is formal, and evidence provided at the summary judgment stage need only be admissible in content, not necessarily in form." *Erickson v. Baxter Healthcare, Inc.,* 151 F.Supp.2d 952, 960 (N.D. Ill. 2001) (quoting *Winskunas v. Birnbaum,* 23 F.3d 1264, 1267–68 (7th Cir. 1994)).

## IV.    Wexford Policies

Wexford has treatment guidelines that outline general types of care that should be provided to patients but each individual case may differ. (Dkt. 214 at ¶ 43). The treatment guidelines do not mandate care or a particular course of treatment for any particular patient. (*Id.*). Wexford's physicians provide evaluations and treatment to inmate-patients based upon their own medical training, certifications, knowledge, and experience in the medical field. (*Id.*). Wexford medical personnel are required to use their own, independent, professional medical judgment when providing medical care. (*Id.*).

The parties dispute whether Wexford requires its practitioners to maintain records for examinations of inmates. According to an affidavit submitted by Wexford's Corporate Medical Director for Quality Management and Pharmacy, Dr. Neil Fisher, when a practitioner such as Dr. Zhang performs a medical examination of an inmate, the practitioner generates a written medical progress note of their interaction with that inmate which is maintained in the inmate's IDOC medical file. (Dkt. 214 at ¶¶ 38-40). Plaintiff disputes these assertions based on Dr. Zhang's testimony that she had no knowledge of such requirement and on the undisputed fact that the Physician Assistant failed to complete her notes on the date of his March 19 appointment. (*Id.* at ¶ 40).

Additionally, according to Dr. Fisher, Wexford does not have any policies or procedures incentivizing its healthcare employees to deny medical care for any reason and does not provide any direction to its employees to deny necessary medical care to inmates for any reason. (Dkt. 214 at ¶ 46). Plaintiff disputes this assertion, asserting generally that medical providers at Stateville often failed to review inmate charts before treatment and rushed examinations and

treatments in order to get the inmates back to their cells. (*Id.*; Dkt. 221 at ¶ 27). Dr. Zhang testified that she would review a patient's chart before the appointment if time permitted. (*Id.* at

Plaintiff has never seen or reviewed any of Wexford's written policies or its contracts with IDOC and admits that he has no documentation to support his claim against Wexford. (Dkt. 214 at ¶ 28).

## **LEGAL STANDARD**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court's primary function is not to "evaluate the weight of the evidence or to determine the truth of the matter," but to determine whether there is a general issue for trial. *See, e.g., U.S. Commodity Futures Trading Comm'n v. New World Holdings, LLC*, No. 10 C 4557, 2012 WL 983790, at *2 (N.D. Ill. Mar. 21, 2012) (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994)). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). The party moving for summary judgment bears the initial burden of production to show that no genuine issue of material fact exists. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Upon such a showing, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). These facts must demonstrate that the genuine issue is material and not simply a factual disagreement between the parties. *Id.* (quoting *Logan*, 96 F.3d at 978). The "nonmovant fails to demonstrate a genuine issue

for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.*

**DISCUSSION**

Plaintiff alleges claims under 42 U.S.C. § 1983 against Dr. Zhang and Wexford for failure to provide him with adequate medical care in violation of his rights under the Eighth Amendment. First, Plaintiff claims that Dr. Zhang was deliberately indifferent to his serious medical condition by allegedly ignoring his complaints of abdominal pain and by delaying in treating his condition. Plaintiff sues Dr. Zhang in both her individual and official capacity. Second, Plaintiff states a *Monell* claim[2] against Wexford, alleging Wexford had a policy of providing the least amount of medical care possible to inmates and for failure to train physicians regarding basic medical procedures and protocols. Defendants move for summary judgment on all claims against them.

**I.     Section 1983 Claims Against Dr. Zhang**

"Every claim by a prisoner that he has not received adequate medical treatment is not a violation of the Eighth Amendment." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016), *as amended* (Aug. 25, 2016), *cert. denied*, 137 S. Ct. 1578 (2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "But the Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Id.* (quoting *Estelle*, 429 U.S. at 105); *see also Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). "Accordingly, 'deliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 104).

---

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

To prevail on a claim of deliberate indifference, Plaintiff must show that (1) he "suffered from an objectively serious medical condition," and (2) "the individual defendant was deliberately indifferent to that condition." *Petties*, 836 F.3d at 728. Defendants argue that Plaintiff fails to raise a genuine question of material fact as to either element.

Plaintiff sues Dr. Zhang in both her official and individual capacity. A claim against Dr. Zhang in her official capacity is treated as a claim against Wexford. *See Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008). To state a claim against Dr. Zhang in her official capacity, Plaintiff must show that she acted pursuant to an "(1) an official policy; (2) a practice or custom that although not officially authorized, was widespread and well settled; or (3) instructions from a city official with final policy-making authority." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012); *Monell*, 436 U.S. at 690. Plaintiff alleges Dr. Zhang acted pursuant to Wexford's policy and practice "to perform as less medical treatment and cost effective treatment as possible." (Dkt. 11 at ¶ 10). Plaintiff's official capacity claim is identical to the *Monell* claim brought under the same theory against Wexford and, therefore, is addressed below.

To succeed on an individual capacity claim under § 1983, Plaintiff must establish that Dr. Zhang was personally responsible for a deprivation of his rights. *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 469 (7th Cir. 2016). To establish personal responsibility, Plaintiff must at least show that Dr. Zhang had knowledge of and consented or acquiesced in some way to the conduct causing the alleged deprivation of rights. *Id.* As an initial matter, Plaintiff has failed raise a genuine issue of fact as to whether Dr. Zhang knew of his complaints of abdominal pain made *before* his first appointment with her on February 11. It is undisputed that Dr. Zhang had no involvement whatsoever in the intake of sick call requests or the scheduling of inmates' appointments based on those requests. Additionally, nothing in Plaintiff's medical record indicates

Plaintiff made any complaints before February 11, 2009 and, even if there were such notes in the record, Dr. Zhang may not have seen them since, as Plaintiff concedes, Dr. Zhang did not review each patient's chart before an appointment and Dr. Zhang testified that she could not recall reviewing Plaintiff's chart before treating him on February 11. Therefore, to the extent Plaintiff seeks to hold Dr. Zhang liable for lack of medical care before the February 11 appointment, he has failed to provide evidence from which a reasonably jury could make such inference. *See, e.g., Sharif v. Carter*, No. 12 C 5685, 2017 WL 3421554, at *8 (N.D. Ill. Aug. 8, 2017) (granting summary judgment in favor of defendant where evidence sufficiently established defendant did not receive plaintiff's letters and had no knowledge of plaintiff's complaints so as to be held liable for deliberate indifference to his medical needs). Similarly, Plaintiff fails to present any evidence of personal involvement by Dr. Zhang in Plaintiff's care after he was transferred to Lawrenceville in late May 2009. To the extent Plaintiff attempts to hold Dr. Zhang liable for any alleged inadequate care after that date, such claim is also dismissed.

Therefore, the Court focuses on Plaintiff's deliberate indifference claim against Dr. Zhang based on the care provided between February 11, 2009 and when Plaintiff was transferred in late May 2009.

### A.     Objectively Serious Medical Condition

Defendants argue that Plaintiff's condition—which they characterize as merely "a complaint of abdominal pain and a mild infection, which was quickly resolved"—never rose to a level of objectively serious medical need. (Dkt. 206 at ¶¶ 13-14). "A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elaya*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d

645, 653 (7th Cir.2005)). "Notably, '[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir.2010)). It is undisputed that Dr. Zhang diagnosed Plaintiff's condition as H-pylori which is a bacterial infection which needs prescription medication for treatment and Plaintiff received that medication to treat that condition. The Court finds, therefore, that Plaintiff had an objectively serious medical condition. *See, e.g., Lee v. Wexford Health Sources, Inc.*, No. 1:13-CV-03255, 2016 WL 4429642, at *3 (N.D. Ill. Aug. 22, 2016) (plaintiff had "objectively serious medical need" where it was undisputed that he was diagnosed with beta-hemolytic strep ("Strep B") and given prescriptions to treat his condition); *Williams v. Sangamon Cty. Jail*, No. 14-3064, 2016 WL 659656 (C.D. Ill. Feb. 18, 2016) (jury could find that Plaintiff who was prescribed antibiotics and pain medication to treat Staph infection suffered from an objectively serious medical need).

**B.     Deliberate Indifference**

"To determine if a prison official acted with deliberate indifference, [the Court] look[s] into his or her subjective state of mind." *Petties*, 836 F3d at 728. A plaintiff need not show that the official intended harm or believed that harm would occur but showing mere negligence is not enough. *Id.*; *see also Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts."). "[P]laintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (emphasis in original) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk."). The Court looks

at "the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* at 728. Plaintiff claims that Dr. Zhang was deliberately indifferent to his serious medical condition because she ignored Plaintiff's complaints of abdominal pain and delayed in treating his condition.

### i.     Ignoring a Request for Medical Assistance

A prison official's decision to ignore a request for medical assistance can be enough to show deliberate indifference. *See Petties*, 836 F.3d at 729. "[A] prisoner is not required to show that he was literally ignored." *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir.2000)). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. Where the risk may be imperceptible to a lay person, "a medical professional's treatment decision must be 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Id.* (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

Here, Plaintiff argues that Dr. Zhang ignored his complaints because she "told [him] that it was nothing, that he had gas, and to drink some water," "only spent 10 minutes with him," "did not take his complaints seriously," "was getting irritated and just wanted to send [him] back to his cell," "did not take any type of history from Plaintiff regarding his abdominal pain," "did not examine his abdomen," "did not prescribe him any medication for the pain," "only ordered a blood test because Plaintiff insisted" and "did not schedule a follow-up appointment." (Dkt. 212 at 5). But the undisputed facts undermine Plaintiff's position. It is undisputed that at Plaintiff's first appointment with Dr. Zhang, Dr. Zhang made note of Plaintiff's complaint of abdominal pain in

the record and ordered a blood test. (Dkt. 214 at ¶¶ 15-16). Whether Dr. Zhang ordered the test based on her own medical judgment or because Plaintiff insisted she do so is immaterial; the point is that she began the process of providing treatment. It is also undisputed that Dr. Zhang told Plaintiff she would contact him when the results came back and, as promised, saw Plaintiff for a follow-up appointment on February 20, 2009 to discuss the test results. (*Id.* at ¶ 30). Finally, Plaintiff does not dispute that Dr. Zhang prescribed Plaintiff antibiotics and Prilosec which he received on February 24. (*Id.* at ¶ 32).

All that is left of Plaintiff's claim that Dr. Zhang ignored his complaints is that she told him nothing was wrong, was irritated with him, only spent 10 minutes with him, and did not take Plaintiff's history with regard to his abdominal pain or perform an examination of his abdomen. None of these alleged failures to act present a risk so obvious to Plaintiff's condition that a reasonably juror could infer Dr. Zhang actually ignored his complaint, particularly in light of the fact that she ordered a blood test to determine the cause of his symptoms and promised to follow-up once the test results were in. Indeed, the fact that Dr. Zhang addressed Plaintiff's non-asthma-related condition during his visit to the asthma clinic shows she did not ignore his request but rather made a point to address his complaints contrary to normal protocol, which would have been to instead schedule a follow-up or sick call appointment to treat the non-asthma-related condition at a later date. (*See* Dkt. 212 at ¶ 9).

Notably, Plaintiff offers no expert testimony or other evidence whatsoever to demonstrate that the failure by Dr. Zhang to take Plaintiff's history, examine his abdomen, or provide some other form of treatment before running the blood test is "such a substantial departure from accepted professional judgment" to constitute deliberate indifference. *See, e.g., Petties*, 836 F.3d at 729 (even "evidence that *some* medical professionals would have chosen a different course of treatment

is insufficient to make out a constitutional claim") (emphasis in original). Due to several extensions granted to the parties by the judge who was previously monitoring this case, the parties had more than *seven* years to complete discovery. Yet Plaintiff fails to present any evidence showing whether any action or inaction taken by Dr. Zhang contravened accepted professional standards, much less disregarded them entirely. (Plaintiff was given a recruited attorney to represent him in this matter.) When a medical professional acts in her professional capacity and according to her professional judgment, as Dr. Zhang did here, she is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under [the] circumstances" at issue. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). In other words, she "may be held to have displayed deliberate indifference *only if* the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* The record before the Court is devoid of any evidence—for example, expert testimony as to applicable professional standards of practice in treating patients with severe abdominal pain— from which a jury could ascertain whether Dr. Zhang's course of action was so far afield of accepted practices to constitute deliberate indifference.

Therefore, the Court grants Defendants' Motion for Summary Judgment on the deliberate indifference claim against Dr. Zhang based on the allegation that she ignored his complaints.

### ii. Delay in Providing Treatment

Plaintiff next complains that Dr. Zhang was deliberately indifferent to his serious medical condition by delaying in treating his condition—first by delaying in providing him medication for his infection, thereby unnecessarily prolonging his pain by two weeks, and second by delaying in providing any follow-up treatment, thereby unnecessarily prolonging his pain by five months and

causing or aggravating his peptic ulcer. (Dkt. 212 at 9). "[D]elays in treating painful medical conditions, even if not life-threatening, may support an Eighth Amendment claim." *Rodriguez*, 577 F.3d at 829 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir.1997)). "Of course, delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730.

To succeed on a deliberate indifference claim based on a delay in treatment, the plaintiff must provide independent, verifying medical evidence that the delay exacerbated the injury or unnecessarily prolonged pain. *Id.* at 703-31; *Conley*, 796 F.3d at 749 ("In cases where prison officials delayed rather than denied medical assistance to an inmate, the plaintiff must offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm."). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007). Expert testimony that the plaintiff suffered because of a delay would clearly satisfy this requirement; however, mere recitation of the plaintiff's diagnosis and treatment alone would not "if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him." *Id.*

With regard to the first claim regarding the delay in receiving his prescription, the record shows that Dr. Zhang ordered the blood test the day of Plaintiff's first appointment with her on February 11, 2009, reviewed the results seven days later on February 18, 2009 and, just two days after that, had a follow-up appointment with Plaintiff during which she explained the results to Plaintiff on February 20, 2009. The parties dispute whether Plaintiff also issued the prescription on February 20 or failed to do so until four days later on February 24. Dr. Zhang is not responsible

for and therefore cannot be held personally liable for any delay in conducting lab tests or scheduling inmates' appointments. Dr. Zhang is responsible only for ordering the blood test, reviewing the results and issuing the prescription. There is no doubt that Dr. Zhang ordered the blood test at the first opportunity possible, on February 11, 2009 when she first heard Plaintiff's complaints. Therefore, she can only be held liable for four days of the alleged two-week delay if in fact she failed to issue the prescription until February 24, four days after knowing it would help Plaintiff's condition. If she issued the prescription on February 20, she could not be liable because IDOC-employed nurses and medical technicians are responsible for filling and delivering the prescription to Plaintiff, not Dr. Zhang. (Dkt. 214 at ¶ 17).

Plaintiff claims the prescription order form appears to have been originally dated later in February but was then changed to February 20, 2009. (Dkt. 221 at ¶ 18). Dr. Zhang testified that she issued the prescription on February 20, but the date on the form appears as though it could have been changed and whether it was changed consistent with Plaintiff's allegation is a proper question for the jury. (*See* Dkt. 205-1 at 142). Therefore, Plaintiff raises a genuine issue of material fact as to whether Dr. Zhang delayed in issuing the prescription.

However, Plaintiff must also provide independent medical evidence that the alleged four-day delay and not his underlying condition caused him injury. Plaintiff testified that in the two weeks he waited for his prescription, he "was getting weaker, lost weight, continued to experience sharper pains and his bowel movements got worse." (Dkt. 212 at ¶ 14). Additionally, it is undisputed that once Plaintiff received the medication, his symptoms improved. (Dkt. 214 at ¶ 33; Dkt. 221 at ¶ 20). Viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could conclude that four days without readily available medication unnecessarily prolonged his pain, particularly given the simplicity of the treatment and extent of pain Plaintiff claimed he was

in. *See, e.g., Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) ("[G]iven the extreme simplicity of treatment—supplying the sufferer daily with a few pills of an over-the-counter drug—a jury would not be irrational to conclude that the defendants . . . knew that the plaintiff had a very unpleasant, potentially dangerous, yet readily treatable disease, yet they had done nothing for two months because they were indifferent to the plaintiff's condition."); *Williams*, 491 F.3d at 716 (where medication almost immediately relieved plaintiff's pain and lowered his blood pressure, jury could find that delay in providing treatment caused plaintiff extra six hours of pain and elevated blood pressure).

With regard to the second claim, Plaintiff alleges Dr. Zhang also delayed in providing any follow-up treatment for Plaintiff's persisting pain. First Plaintiff must show that Dr. Zhang was aware that Plaintiff's pain continued even after receiving his prescribed medication. Nothing in the medical record shows that Plaintiff made any complaint of continued abdominal pain to Dr. Zhang at the April 11 appointment or to the Physician's Assistant at his March 19 appointment. (Dkt. 205-1 at 45-47). The Physician's Assistant noted in Plaintiff's chart on April 7 that she had been informed that Plaintiff had filed a grievance related to abdominal pain. (Dkt. 205-47). However, even if Dr. Zhang saw the Physician's Assistance note before the April 11 appointment—which is questionable as she testified she does not necessarily review patients' charts before appointments—she would have seen only that Plaintiff had filed a grievance about his abdominal pain treatment and not that Plaintiff continued to complain about actually having abdominal pain. To counter all of this, Plaintiff testified that he did in fact complain about his abdominal pain each time he visited a healthcare provider in Stateville, including at the March 19 and April 11 appointments, but that providers consistently told him he was not being treated for that issue at that time and would not provide any treatment for his complaint. (Dkt. 221 at ¶ 20).

Plaintiff's testimony raises a genuine issue of material fact as to whether Dr. Zhang knew of Plaintiff's persistent pain, particularly as the medical records are silent on the issue and his testimony is consistent with the undisputed practice that providers generally treat patients only for the condition for which they are being seen on that day. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) (Provided the evidence is based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial, "self-serving testimony is an acceptable method for a nonmoving party to present evidence of disputed material facts.").

Again, Plaintiff must also provide independent medical evidence that the alleged delay in providing follow-up treatment caused him injury. The record shows that in July 1, 2009, the medical personnel at Lawrenceville conducted another test which tested positive for H-pylori of 3.1 and diagnosed him with a peptic ulcer. (Dkt. 221 at ¶ 26). Although Plaintiff's infection improved from a result of 7.5 to 3.1, a reasonable jury could find based on Dr. Zhang's own testimony about the risks of untreated H-pylori that the delay in treatment caused Plaintiff to develop a peptic ulcer. Additionally, Dr. Zhang's testimony that it was her routine practice to conduct a repeat test if a patient continued to complain of pain months after receiving medication also supports Plaintiff's claim that the delay in providing such repeat test could cause further injury.

Therefore, the Court denies Defendants' Motion for Summary Judgment on the deliberate indifference claim against Dr. Zhang based on the delay of treatment.

## II.     Section 1983 Claims Against Wexford

A municipality cannot be held liable on a theory of *respondeat superior* under § 1983. *Rodriguez*, 577 F.3d at 822. A municipality may be liable for damages under § 1983 only if the

unconstitutional act is caused by: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). Additionally, Plaintiff "must demonstrate that the defendants' official policy, widespread custom, or action by an official with policy-making authority was the moving force behind his constitutional injury." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016) (internal quotations omitted). The same standard applies to private corporations acting under color of law. *Shields v. Ill. Dept. of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Neither party disputes that Wexford is a private corporation acting under the color law for purposes of Plaintiff's claims.

Plaintiff's *Monell* claim against Wexford is based on two theories: first, that Wexford has a policy and practice of providing the least amount of medical care possible to inmates and second, that Wexford fails to train its physicians regarding basic medical procedures and protocols.

With regard to the first, Plaintiff may establish an official policy or custom exists by identifying an express policy that explicitly violates a constitutional right when enforced or by showing Wexford engaged in a widespread practice "so permanent and well settled as to constitute a custom or usage with the force of law" that caused the constitutional violation. *See Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (internal citations omitted). Plaintiff admits that he has never seen or reviewed any of Wexford's policies. (Dkt. 214 at ¶ 28). Plaintiff argues instead that the policy of providing the least amount of medical care possible was implicit. *See Daniel*, 833 F.3d at 734 ("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies.") An implicit policy claim falls under the "widespread practice" theory

of liability. *See, e.g., Johnson v. Frain*, No. 17 C 2000, 2018 WL 2087448, at *3 (N.D. Ill. May 4, 2018) ("Where the alleged constitutional deprivation resulted from an implicit policy, a plaintiff must present evidence of a widespread practice.")

To establish that a "widespread practice" exists, Plaintiff must provide "evidence that there is a true municipal policy at issue, not a random event." *Calhoun*, 408 at 381. Plaintiff can meet this burden by offering "competent evidence tending to show a general pattern of repeated behavior (i.e., something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734 (internal quotations omitted). Plaintiff may rely on incidents relating only to him, *see White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016), but he still must allege multiple such incidents occured. Plaintiff may also rely on indirect proof, but "[t]his requires more than a showing of one or two missteps." *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). When a plaintiff relies on indirect proof, the Court "look[s] to see if a trier of fact could find 'systemic and gross deficiencies in staffing, facilities, equipment, or procedures' in a detention center's medical care system." *Id.* "[E]ven if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them." *Id.*

Plaintiff admits that he has never seen or reviewed any of Wexford's policies and has no documentation to support his claim against Wexford. (Dkt. 214 at ¶ 28). Therefore, Plaintiff's own opinion or belief that such policies exist is insufficient, as it is not based on personal knowledge of Wexford practices. *See Montague v. Wexford Health Sources, Inc.*, 615 F. App'x 378, 379 (7th Cir. 2015) (affirming summary judgment against plaintiff on *Monell* claim where plaintiff "relied on his own opinion and that of some other inmates," which were "not personal knowledge of Wexford's practices" and, therefore, do "not count as evidence"). Additionally, the Court notes that it is unclear how a policy by which Wexford provides the least amount of medical

care would be to Wexford's advantage. *See id.* ("It is not clear why such a policy [of delaying referrals to medical personnel outside the prison] would be to Wexford's advantage; unwarranted delay in obtaining medical assistance leads to medical complications that drive up the eventual cost.").

To support his claim that Wexford has a policy of providing the least amount of care possible, Plaintiff points to evidence of two practices: that Wexford physicians would only treat a patient for the condition for which his or her appointment was scheduled and that Wexford physicians would rush through their treatment of patients, including by not reviewing patient charts before appointments. (Dkt. 212 at 13-14). Defendants do not dispute that as a general practice, Wexford physicians required a follow-up or sick call appointment to treat conditions unrelated to plaintiff's scheduled appointment or that physicians did not always review a patient's chart before seeing that patient. (Dkt. 221 at ¶ 9). They dispute, however, that either practice inherently violates a constitutional right, and the Court agrees. Plaintiff fails to show that either practice itself evidences a systemic and gross deficiency in procedure in the Stateville healthcare system. Specifically, Plaintiff fails to offer any evidence beyond his own opinion that these practices constitute deliberate indifference to patients' medical needs.

With regard to Plaintiff's second claim, failure to train employees about their legal duties to avoid violating an individual's rights may rise to the level of an official policy for purposes of § 1983 only "in limited circumstances." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). Additionally, Plaintiff must show a pattern of similar constitutional violations to demonstrate deliberate indifference for purpose of a failure-to-train claim. *Id.* at 62.

Plaintiff alleges Wexford failed to train its physicians on its procedures and protocols, including maintaining medical records and documenting medical encounters with patients. Again, Plaintiff offers no evidence that the failure to maintain records or document medical encounters in a specific way constitutes deliberate indifference. Regardless, Wexford's policy permits physicians to exercise their medical judgment in providing care, which by definition does not constitute deliberate indifference. (Dkt. 214 at ¶ 43); *see Petties*, 836 F.3d at 729 (to constitute deliberate indifference, a treatment decision must be "a substantial departure from accepted professional judgment"). Moreover, Plaintiff relies only on his own experience and fails entirely to identify any other incidences of constitutional violations similar to that which he alleges in his Complaint, as is required for a failure-to-train claim.

Finally, to the extent Plaintiff sues Wexford based solely on the fact that it is Dr. Zhang's employer (*see* Dkt. 214 at ¶¶ 27-28), such claim is dismissed as improper under § 1983. *See Rodriguez*, 577 F.3d at 822 (neither public nor private entities may be held vicariously liable under § 1983).

Therefore, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's *Monell* claim against Wexford.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Dkt. 204) is granted in part and denied in part. Plaintiff's deliberate indifference claim against Dr. Zhang based on her alleged ignoring of Plaintiff's complaint is dismissed with prejudice, as is Plaintiff's *Monell* claim against Wexford. The only claim that remains is Plaintiff's deliberate indifference claim against Dr. Zhang based on the alleged delay in treatment.

Hon. Virginia M. Kendall
United States District Judge

Date: August 3, 2018